# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | |
|---|---|
| TONYA JOHNSON HYLES, | ) |
| | ) |
| Movant, | ) |
| | ) |
| v. | ) No. 1:10CV00015 HEA |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

**GOVERNMENT'S RESPONSE TO MOVANT'S MOTION TO
VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. §2255**

COMES NOW the United States of America, by and through its attorneys, Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and Cristian M. Stevens and Thomas E. Dittmeier, Assistant United States Attorneys for said District, and responds to movant Tonya Johnson Hyles' Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. §2255, as follows:

## I. Introduction

On January 13, 2010, movant Tonya Johnson Hyles ("Johnson Hyles"), through counsel, filed her Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. One week later, on January 20, 2010, Johnson Hyles filed a memorandum in support of her motion and a Motion for Extension of Time to File Supplement to Memorandum in Support of Section 2255 Motion, requesting until March 22, 2010, to file a supplemental memorandum.

On January 25, 2010, this Court entered an order granting Johnson Hyles' Motion for Extension of Time to File Supplement to Memorandum in Support of Section 2255 Motion and granting Johnson Hyles until March 22, 2010, to file a supplemental memorandum. On January 27, 2010, this Court entered its Case Management Order, in which it directed the Government to

show cause why the relief requested in Johnson Hyles' Motion to Vacate, Set Aside, or Correct Sentence should not be granted. The March 22, 2010, deadline expired, and Johnson Hyles did not file the anticipated supplemental memorandum.

In her motion and memorandum, Johnson Hyles requests that the Court vacate the judgment against her due to ineffective assistance of counsel regarding proffer discussions and immunity and plea negotiations with the Government.

This Court directed respondent the United States of America ("the Government") to show cause why the post-conviction relief requested by Johnson Hyles should not be granted. This pleading is the Government's response.

## II.  Statement of Facts

Because this Court is well acquainted with the circumstances of this case, see United States v. Hyles, 479 F.3d 958 (8th Cir. 2007); United States v. Cannon, 457 F.3d 1013 (8th Cir. 2007), this recitation of facts is abbreviated.

### A.  The Planning and Murder

On August 10, 2000, Coy Smith was the only witness against Tyrese Hyles, Johnson Hyles' husband, at a state preliminary hearing in Caruthersville, Missouri. Johnson Hyles was present and saw Smith testify. Tr. Trans. II 76-77, 265-266.

After the hearing, Tyrese Hyles offered to bond David Carter out of jail and give Carter a Pontiac Parisienne in return for killing Smith. Carter agreed. Tr. Trans. II 78-79. Tyrese Hyles called Johnson Hyles at her apartment and asked her to bond Carter out of jail. Tr. Trans. II 266-267. By her own admission, Johnson Hyles bonded Carter out of jail. Tr. Trans. II 268. She told the bondsman she had just sold the Pontiac Parisienne to Carter and the car would be the

collateral on the bond. Tr. Trans. II 79-81, 150-152.

At some point, Johnson Hyles drove Carter past Smith's house. Tr. Trans. II 125. She also drove Carter home, where he later received a three-way call from Johnson Hyles and Tyrese Hyles. Tr. Trans. II 82-83, 134, 180-183. Tyrese Hyles told Carter to go to Johnson Hyles' apartment, where he received another call from Tyrese Hyles telling him the murder weapon was on the way. Tr. Trans. II 83-84.

Johnson Hyles met with Samuel Anderson and told Anderson that she was "going to get somebody to take care of [Coy Smith's] ass." Tr. Trans. II 222. Johnson Hyles asked to borrow a gun, and Anderson later brought a stainless steel Beretta 9mm handgun to Johnson Hyles at her apartment. Tr. Trans. II 222-225. Johnson Hyles admitted she arranged to get the gun from Anderson. Tr. Trans. II 267; Apdx. 51-52. Johnson Hyles transferred the gun to Carter. Tr. Trans. II 85.

During the evening of August 10, there was a flurry of phone calls to Johnson Hyles' apartment. Two of the calls originated from Tyrese Hyles' jail cell at 7:50 p.m. and 8:34 p.m., when Tyrese Hyles was calling to arrange the transfer of the gun. Tr. Trans. II 134, 181-182. Four other calls came from Amesheo Cannon's residence in Memphis at 8:11, 8:23, 8:39, and 8:43 p.m. The last call overlapped with a call from Tyrese Hyles' jail cell. Tr. Trans. III 49-50.

According to Johnson Hyles, Anderson subsequently told her he retrieved the gun from Carter. Tr. Trans. II 268-269. On August 14, April Leatherwood, Cannon's girlfriend, received a call from Cannon. He told her that Johnson Hyles was going to drive him from Memphis to Caruthersville. Tr. Trans. III 22, 51-52.

On August 15, Johnson Hyles and Hendrietta Nichols drove to Memphis in the Pontiac

3

Parisienne and brought Cannon to Caruthersville. Tr. Trans. IV 8-10. After Cannon arrived in Caruthersville, he exited the passenger side of Johnson Hyles' Pontiac Parisienne and approached Anderson to get the gun. Anderson gave the gun to Cannon. Tr. Trans. II 228-231.

On August 18, Carter returned to the Pemiscot County jail. Tyrese Hyles told Carter his failure to kill Smith was "fucked up" and he would have done it for Carter. Tr. Trans. II 88.

At approximately 6:30 p.m. on August 20, Johnson Hyles drove Cannon past Coy Smith as he stood outside. As Johnson Hyles drove by, Cannon slid down in the seat to avoid being seen. Tr. Trans. III 4-6. Approximately 30 minutes later, Johnson Hyles and Cannon stood in an unmonitored area outside the Pemiscot County jail and communicated through the window to Tyrese Hyles' cell. Tr. Trans. III 9-10, 13, 16-18.

Later that evening, Cannon went to April Leatherwood's house. Cannon was driving Johnson Hyles' Pontiac Parisienne. Leatherwood observed Cannon cutting eye holes out of a black scarf to make a mask. At about 3:00 a.m. on August 21, Cannon and Rontae Stewart left Leatherwood's apartment. Tr. Trans. III 25-26. Coy Smith's house was two blocks from Leatherwood's house. Tr. Trans. III 34.

At approximately 3:15 a.m., Coy Smith's wife, Mae Smith, awoke and saw a man with a silver gun in his hand. She ran to a closet. Tr. Trans. I 31-32. When she exited the closet, she found that Coy Smith was dead, both phones in her house were not working, the front porch light was off, and the porch light had been removed. Tr. Trans. I 33-34, 35.

**B. The Investigation**

At the scene, the police found spent 9mm bullets and casings. Tr. Trans. II 8, 12. The front light bulb had been removed, the door knob was loose, and the phone wires had been cut.

4

Tr. Trans. II 17-20, 25-26.

As the police processed the evidence, Cannon and Stewart walked by 30 or 40 times. The officers seized Stewart's shoes because they were the same make and general size of shoe prints found outside Smith's home. Tr. Trans. II 20-23.

The autopsy revealed that Coy Smith was shot behind the right ear and twice in the back. Tr. Trans. III 76-79. The cause of Coy Smith's death was a gunshot wound to the head. The manner of death was homicide. Tr. Trans. III 79.

Several days after the murder, Cannon told Anderson he unscrewed the front light bulb, disconnected the door knob, and shot Smith. Tr. Trans. II 234-235.

On August 29 and September 3, Cannon was issued traffic summonses while driving the same Pontiac Parisienne that had been promised as consideration for the murder. Tr. Trans. III 62-65.

In December 2001, Cannon was detained in this case. A sheriff's deputy recovered photographs in Cannon's property depicting the Pontiac Parisienne, and Tyrese Hyles and Cannon posing together. Tr. Trans. II 209-210.

### III. Procedural History

#### A. The Charges

Johnson Hyles originally was charged in a federal complaint issued by United States Magistrate Judge Lewis M. Blanton on June 5, 2001. The complaint charged Johnson Hyles and Tyrese Hyles with aiding and abetting the murder for hire of Coy Smith. On June 6, 2001, Johnson Hyles was arrested and detained on the complaint. Hr'g Trans. I 49.

Johnson Hyles initially purported to cooperate with the investigation and entered into a

5

proffer letter with the Government on June 11, 2001. Ex. A (Proffer Letter). On June 14, 2001, the federal grand jury returned a single-count indictment charging Johnson Hyles with aiding and abetting murder for hire. The charges against her were dismissed without prejudice on October 24, 2001, because her trial date of October 29, 2001, was fast approaching. Hr'g Trans. I 68, 96-97; Hr'g Trans. II 12. Johnson Hyles ultimately failed to cooperate and did not testify against either Cannon or Tyrese Hyles.

Following Cannon's trial, the federal grand jury returned an indictment against Johnson Hyles on May 5, 2005. The indictment charged that Johnson Hyles conspired to commit murder for hire, aided and abetted murder for hire, possessed a firearm in furtherance of the murder for hire conspiracy, and conspired for a felon to possess a firearm. This is the indictment on which Johnson Hyles ultimately was tried.

**B. The Motion for Specific Performance**

Months before trial, Johnson Hyles moved for specific performance of an alleged cooperation agreement with the Government. Johnson Hyles requested that this Court dismiss the indictment because, according to her, the Government breached the purported cooperation agreement by re-indicting her. In her motion, Johnson Hyles alleged she "maintained her side of the bargain in providing truthful answers to all questions put to her." Ex. B at ¶ 12 (Motion for Specific Performance).

On October 27, 2005, the magistrate court held the first of two lengthy hearings on Johnson Hyles' motion. At the hearing, the Government adduced evidence regarding the June 11, 2001, proffer letter and Johnson Hyles' failure to abide by its terms. The evidence was as follows.

6

In the proffer letter, Johnson Hyles agreed, among other things:

For the purpose of allowing the prosecution to assess the credibility and value of the evidence and possible testimony that your client says she can provide, she must agree to first reveal everything she knows about the criminal activities of her, the co-defendants and others . . ., and to do so completely, truthfully, and without guile.
. . .
In the event the information contained in your client's proffer is deemed by this office to be truthful, candid, and meritorious, this office will engage in negotiations involving specific concessions which will be made on behalf of the Government in exchange for your client's further cooperation.
. . .
[I]f your client knowingly provides untruthful information or if she knowingly withholds the full truth from Government agents and/or Assistant United States Attorneys during the course of the proffer, the promise not to directly use what she says against her shall be null and void. Not only would your client then no longer be afforded the <u>use immunity</u> as previously set forth herein, but she would also be subjected to prosecution for perjury for any intentional deviation from the truth (emphasis in original).
. . .
Overriding all else, at all times she shall tell the truth and nothing other than the truth during this investigation.
. . .
At this time the Government is not entering into any plea agreement or negotiations or representing that it will enter into any plea agreement or negotiations. Any plea agreement or negotiations the Government may enter into will be determined after the interview and shall be left to the sole discretion of the United States Government. Ex. A (Proffer Letter).

Pursuant to the proffer letter, Johnson Hyles proffered on June 11, 2001, that: when she approached Anderson to get the murder weapon, she told Anderson she was going to give the gun to Carter to kill Coy Smith; when Anderson brought the gun to Johnson Hyles' apartment, she refused to touch it, and Anderson placed it on the couch; Carter, who also was in Johnson Hyles' apartment, retrieved the gun from the couch; Carter told Johnson Hyles that he had killed someone before and intended to kill Coy Smith; a few days after obtaining the gun from Anderson, Johnson Hyles saw Cannon in Caruthersville; and Johnson Hyles knew Cannon lived

in Memphis in the summer of 2000 only because Cannon had told her he had a parole officer there. Hr'g Trans. I 52-57.

On June 14, 2001, the federal grand jury returned a single-count indictment charging Johnson Hyles with aiding and abetting murder for hire. On the same day, Johnson Hyles proffered additional information that, the night before the murder, Cannon and Johnson Hyles drove past Coy Smith, and Cannon remarked, "I'm going to kill him." Johnson Hyles had not previously disclosed this information. Hr'g Trans. I 57-59.

On August 7, 2001, Johnson Hyles repeated that Anderson brought a gun to her apartment and offered her the gun. Johnson Hyles refused to handle the gun and told Anderson to put the gun on the couch. Hr'g Trans. I 59-60.

On October 18, 2001, Johnson Hyles testified before the grand jury that: Tyrese Hyles did not tell her why he wanted her to bond David Carter out of jail until after she had done so; Johnson Hyles brought Cannon from Memphis to Caruthersville in February or March 2000, well before Tyrese Hyles was jailed; Johnson Hyles saw Cannon in Caruthersville a few days after Tyrese Hyles' preliminary hearing; and when Johnson Hyles approached Anderson to obtain a gun, she did not tell him what the gun was for. Hr'g Trans. I 61-66. The Government previously had asked Johnson Hyles whether she had retrieved Cannon from Memphis, and she denied it. Hr'g Trans. I 64. Excerpts of the grand jury transcript were admitted at trial as Government's Exhibit 118. Tr. Trans. II 264-265.

On October 24, 2001, the Government moved to dismiss the indictment against Johnson Hyles without prejudice because:

> [T]he trial date [of October 29, 2001] on Ms. Hyles was approaching . . . and we had the issue of pursuing charges against Mr. Cannon and Mr. Hyles, and those

8

were the primary focus of the investigation of the prosecution, so we wanted to
pursue that first, and then consider Ms. Hyles at a later time. Hr'g Trans. II 12;
see also Hr'g Trans. I 68, 96-97.

Despite the dismissal of the charges against her, Johnson Hyles was required to give complete and truthful cooperation pursuant to the proffer letter. Hr'g Trans. I 68; Hr'g Trans. II 36-37.

On October 31, 2001, two weeks after Johnson Hyles' appearance in the grand jury, the Government wrote to defense counsel that it had been "receiving information that causes us concern about whether [Johnson Hyles] has been upfront with us about some important facts," and offering to arrange a polygraph examination. The letter concluded, "[I]f we learn that she has violated the terms of her proffer, she will be charged in the conspiracy." Hr'g Trans. I 69-70, 72; Ex. C (Letter of October 31, 2001).

The Government had received credible information that, contrary to Johnson Hyles' previous statements, she went to Memphis to bring Cannon to Caruthersville immediately before the murder, and she did not refuse to touch the murder weapon, but instead took the gun from Anderson and placed it in her kitchen cabinet. Hr'g Trans. I 69-70, 72.

The polygraph examination was set for December 19, 2001. Before the polygraph could be administered, Johnson Hyles admitted that: she drove to Memphis and brought Cannon to Caruthersville days before the murder; she took the gun from Anderson and placed it in her kitchen cabinet, from which Carter retrieved it; she knew her car was used as payment to Cannon for the murder; and Carter told her on August 10, 2000, that Tyrese Hyles told him he could have the car if he killed Coy Smith. All of this information either had not been revealed by Johnson Hyles before or was contrary to her previous statements. Hr'g Trans. I 72-76.

Subsequently, the Government learned from other sources, including audio-taped

9

conversations of Tyrese Hyles, that: Tyrese Hyles had been contacting Johnson Hyles through intermediaries regarding his defense and the Government's case; Cannon stayed at Johnson Hyles' apartment in the days before the murder; Johnson Hyles knew the purpose of bonding Carter out of jail was to kill Coy Smith; and Johnson Hyles told the bail bondsman that she had sold the Pontiac Parisienne to Carter. Hr'g Trans. I 77-81.

On February 8, 2005, just weeks before Cannon's trial date, Johnson Hyles met with the Government. Among other things, Johnson Hyles: denied having any contact with Tyrese Hyles or his associates; denied knowing who Cannon was talking about when they drove past Smith and Cannon stated "I'm going to kill him"; withheld that Cannon stayed at Johnson Hyles' apartment before the murder; withheld that she told the bondsman that she had sold the Pontiac Parisienne to David Carter; and represented that David Carter said he was just "playing" Tyrese Hyles and was not going to kill Smith. Hr'g Trans. I 81-84.

Johnson Hyles' statements were contrary to her previous statements and to other credible evidence possessed by the Government. Johnson Hyles was "wanting to back off her statements that she had given to us," and minimized her role by "leav[ing] herself out of certain portions." Hr'g Trans. I 84-85.

After receiving the above evidence at the first hearing on the motion for specific performance, the magistrate court held a second hearing on November 4, 2005. At the second hearing, Johnson Hyles testified regarding only her final statement to the Government on February 8, 2005. On cross-examination, Johnson Hyles admitted that she was required "at all times to tell the truth and nothing other than the truth during this investigation," Hr'g Trans. II 25, and that she "would be required to continue to disclose all the information [she] had regarding the murder of Coy Smith," Hr'g Trans. II 36-37. Regarding her truthfulness and the

10

extent of her cooperation, she invoked the Fifth Amendment privilege against self-incrimination. Hr'g Trans. II 38-40, 44, 47.

On December 16, 2005, Johnson Hyles filed a post-hearing memorandum in support of her motion for specific performance. Therein, she asked the Court for the first time to "discern" or "infer" the "contemplation of an agreement" – in addition to the proffer letter – in which the Government agreed to dismiss the indictment in exchange for Johnson Hyles' cooperation. Johnson Hyles argued that "implicit in" the alleged agreement was that the Government would not re-indict her. Ex. D (Memorandum).

Following the hearings, Judge Blanton filed a lengthy report and recommendation denying the motion for specific performance. Judge Blanton could "not find any evidence that there was an agreement that the defendant would not be recharged." He further found that Johnson Hyles "had not given complete cooperation in the past, no[r] was her cooperation what was required by the proffer letter after the dismissal of the first indictment against her." Ex. E at 7-8 (Report and Recommendation). Judge Blanton concluded:

> The court finds no evidence to support the defendant's contention that there was an agreement that a second indictment would not be filed against Ms. Hyles. The evidence is to the contrary. The court finds the defendant has not fulfilled her commitment as set out in the proffer letter that she would first, reveal everything she knew about the criminal activities of herself, her co-defendants, Amesheo Cannon and Tyrese Hyles, and any others and to do so completely, truthfully, and without guile. Ex. E at 14 (Report and Recommendation).

This Court filed a memorandum and order adopting the report and recommendation and denying Johnson Hyles' motion for specific performance. Like the magistrate court, this Court found:

> The record is clear . . . based on the proffer letter, defendant's actions vis a vis the proffer, the determination by the United States Attorney's office that defendant had not given complete, truthful and candid information, and the testimony

11

presented to the Court that an agreement defendant seeks to enforce was never formed. Ex. F at 5 (Memorandum and Order).

This Court concluded that, "without defendant satisfying the conditions precedent set forth in the proffer letter, there could be no agreement." Ex. F at 6 (Memorandum and Order).

## C.  The Trial and Conviction

Johnson Hyles' trial began on October 10, 2006, and concluded on October 13, 2006, when the jury returned guilty verdicts on all four counts. Tr. Trans. IV 121-122.

On January 9, 2007, this Court issued its judgment imposing a life sentence. Johnson Hyles timely filed her notice of appeal on the same day.

In an opinion dated April 8, 2008, the Eighth Circuit affirmed Johnson Hyles' convictions. Specifically, the Eighth Circuit expressly rejected Johnson Hyles' argument that the Government violated a non-prosecution agreement. See United States v. Johnson Hyles, 521 F.3d 946, 953 (8th Cir. 2008).

On July 2, 2008, Johnson Hyles filed a petition for a writ of certiorari from the United States Supreme Court. The Supreme Court denied the petition on January 22, 2009.

On January 13, 2010, Johnson Hyles, through counsel, filed her § 2255 motion. One week later, on January 20, 2010, Johnson Hyles filed her memorandum in support of the motion. This Court ordered the Government to show cause why the post-conviction relief requested by Johnson Hyles should not be granted.

## IV. Argument

### A. Introduction

In her § 2255 motion and memorandum in support, Johnson Hyles first alleges that defense counsel was ineffective because, according to Johnson Hyles, counsel "incorrectly advised Tonya Hyles that if she agreed to cooperate with the prosecution and answer the questions of its agents, the government would dismiss all charges against her and she would not be prosecuted in the future." Memo. at 3. Even according to Johnson Hyles, however, any such agreement required that Johnson Hyles "continue to answer questions put to her by the government," and "her continued cooperation in this case." Memo. at 3, 4.

In a related argument, Johnson Hyles also avers that defense counsel provided ineffective assistance "in providing advice regarding the plea offer in this case." Memo. at 10. Johnson Hyles does not allege that defense counsel failed to inform her of a potential plea offer. Indeed, Johnson Hyles concedes not only that defense counsel advised her of a plea offer made by the Government, but also that Johnson Hyles "made the decision to forego the plea." Memo. at 12. Instead, Johnson Hyles' argument is that counsel was ineffective for failing to convince Johnson Hyles to accept the offer. Memo. at 12.

To prevail, Johnson Hyles must prove that her counsel's performance was deficient and overcome the strong presumption that defense counsel's representation fell within the wide range of reasonable professional assistance. See Strickland v. Washington, 466 U.S. 668, 689 (1984); Freeman v. Graves, 317 F.3d 898, 900 (8th Cir. 2003). The parties agree that "[b]ecause a lawyer is presumed to be competent to assist a defendant, the burden is on the accused to demonstrate the denial of the effective assistance of counsel." Memo. at 1 (citing United States v. Cronic, 466 U.S. 648, 658 (1984)).

Johnson Hyles also must prove that she was prejudiced, that is, that a reasonable probability exists that the result of the proceeding would have been different absent defense counsels' errors. Strickland, 466 U.S. at 694; Delgado v. United States, 162 F.3d 981, 982 (8th Cir. 1998). Johnson Hyles can prove neither that her counsels' performance was deficient, nor that any prejudice is more than idle speculation.

**B.  Defense Counsel Was Not Prejudicially Ineffective Regarding Proffer and Immunity Discussions With the Government.**

First, Johnson Hyles alleges that defense counsel provided ineffective assistance by erroneously advising Johnson Hyles that she would not be prosecuted and her statements would not be used against her – that is, if "she would continue to answer questions put to her by the government," in exchange for "her expected future response to their questions," and "in return for her continued cooperation in this case." Memo. at 3, 4. Indeed, at the second motion hearing on this issue, Johnson Hyles testified that she was required "at all times to tell the truth and nothing other than the truth during this investigation," Hr'g Trans. II 25, and that she "would be required to continue to disclose all the information [she] had regarding the murder of Coy Smith," Hr'g Trans. II 36-37. Johnson Hyles knew the terms of the proffer agreement because her lawyer explained it to her and she read the proffer agreement when she signed it. Hr'g Trans. II 24-25.[1]

Thus, Johnson Hyles' entire argument begs the question whether she cooperated as required under the purported agreement. That question was answered in the negative by the

---

[1] Given this testimony, Johnson Hyles' related argument that defense counsel was ineffective "for his failure to explain to his client what was expected from her to constitute continued cooperation with the Government," Memo. at 8, is nothing more than a post-hoc attempt to blame defense counsel for Johnson Hyles' failure to meet her cooperation obligations. Put simply, defense counsel could not cooperate for her.

14

magistrate court, this Court, and the Eighth Circuit. After two lengthy hearings, Judge Blanton found in his exhaustive report and recommendation that Johnson Hyles "had not given complete cooperation in the past, no[r] was her cooperation what was required by the proffer letter after the dismissal of the first indictment against her." Judge Blanton concluded, "The court finds the defendant has not fulfilled her commitment as set out in the proffer letter that she would first, reveal everything she knew about the criminal activities of herself, her co-defendants, Amesheo Cannon and Tyrese Hyles, and any others and to do so completely, truthfully, and without guile." Ex. E at 8, 14 (Report and Recommendation).

Likewise, this Court adopted the report and recommendation, noted "defendant's actions vis a vis the proffer, the determination by the United States Attorney's office that defendant had not given complete, truthful and candid information, and the testimony presented to the Court," and held that "without defendant satisfying the conditions precedent set forth in the proffer letter, there could be no agreement." Ex. F at 5-6 (Memorandum and Order).

Finally, the Eighth Circuit noted the proffer letter's requirement that Johnson Hyles' information be "honest, reliable and worthwhile," and the FBI agent's testimony that, "we knew she had been lying. I think at that point, myself and Mr. Price felt like she still was not giving us everything she knew." Johnson Hyles, 521 F.3d at 952, 953. The Eighth Circuit further found, just as Johnson Hyles acknowledges today, that any concessions to Johnson Hyles were conditional: "*if* the Government believed the information in the proffer was 'truthful, candid and meritorious." Id. at 953 (emphasis in original). The Eighth Circuit concluded that, because "the Government had concerns about her truthfulness . . . , the Government did not breach a non-prosecution agreement." Id.

Thus, even if defense counsel unreasonably construed non-prosecution and immunity

15

agreements from negotiations with the Government, no one denies that any such agreements would have been predicated on Johnson Hyles' truthful and complete cooperation. The record is replete with evidence of Johnson Hyles' failure to meet those conditions precedent.

Johnson Hyles concedes, as she must, that "[t]o show prejudice [under Strickland], '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Memo. at 2 (quoting McCauley-Bey v. Delo, 97 F.3d 1104, 1105 (8th Cir. 1996), and Strickland, 466 U.S. at 694). Because Johnson Hyles failed to cooperate – a requirement under any iteration of the alleged agreement between Johnson Hyles and the Government – she cannot establish any prejudice.

**C. Defense Counsel Was Not Prejudicially Ineffective Regarding Plea Negotiations.**

Johnson Hyles' second argument is that defense counsel was ineffective in advising Johnson Hyles regarding a potential guilty plea. Johnson Hyles begins by arguing that "[a] criminal defense lawyer is obligated to inform his or her client of any bona fide plea agreement offered by the prosecution," but then promptly acknowledges that she "had discussions with his [sic] attorney regarding a plea offer by the Government," and "she made the decision to forego the plea." Memo. at 10, 12. Thus, Johnson Hyles' argument becomes that defense counsel should have convinced her to plead guilty.

As Johnson Hyles acknowledges, "[c]ourts considering claims of ineffective assistance of counsel must presume that attorneys provide effective representation, and 'will not second-guess strategic decisions or exploit the benefits of hindsight.'" Memo. at 10 (quoting Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir. 1997)). In the context of a movant's claim of ineffective assistance of counsel in plea negotiations, "the movant must show that, but for his counsel's advice, he would have accepted the plea." Engelen v. United States, 68 F.3d 238, 241 (8th Cir.

16

1995); see also Sanders v. United States, 341 F.3d 720, 722 (8th Cir. 2003) (quoting Engelen for same proposition). In other words, belated misgivings about having gambled at trial and lost will not suffice.

As defense counsel's attached affidavit establishes, defense counsel had "numerous discussions" with Johnson Hyles regarding the plea offer. Defense counsel discussed with Johnson Hyles the likelihood of losing at trial and the consequences of rejecting the offer. Defense counsel "urged her to take" the plea offer. Johnson Hyles apparently was influenced by her family and opted to reject the offer and proceed to trial. Ex. G (Affidavit of Matthew Hill). Indeed, after the jury returned guilty verdicts, defense counsel noted, "[O]bviously my client has understood the risks in this case throughout . . .." Tr. Trans. IV 124. Thus, defense counsel thoroughly advised Johnson Hyles, and Johnson Hyles made an informed decision. Johnson Hyles cannot establish any deficiency in defense counsel's representation regarding plea negotiations.

Even if defense counsel had not fully advised defendant, Johnson Hyles could not succeed in her claim. A far cry from demonstrating a disposition to plead guilty, Johnson Hyles maintained her innocence throughout the proceedings before this Court and on direct appeal. At the outset, Johnson Hyles argued that her incriminating statements to investigators were coerced. Hr'g Trans. I 5, 7-8. At trial, Johnson Hyles moved for a judgment of acquittal at the close of the Government's evidence, and again at the close of all the evidence. Tr. Trans. III 82; Tr. Trans. IV 22.

Prior to sentencing, Johnson Hyles renewed her motion for judgment of acquittal in writing, attacking the Government's proof on every element of every count of conviction. Ex. H (Motion for Judgment of Acquittal at the Close of the Government's Case and at the End of All

17

of the Evidence). She also filed objections to the presentence investigation report, in which she denied nearly all the facts proved at trial. Ex. I (Objection to Presentence Investigation Report).

At the sentencing hearing, the Government stated, regarding Johnson Hyles' lengthy sentence, "[I]n all candor, she was given every opportunity to change that course." Sent. Trans. 8. This Court agreed:

> [T]here was ample opportunity for the defendant to secure less of a sentence, which she opted out of. That is on her. . . . It is on the decision of your client, and that is why we're here today, and that's why we're looking at the sentence we are looking at, Mr. Hill, because it all started, bottom line, it all started with your client and her decision to do what she did from day one up through today. As they say, it is all on her. Sent. Trans. 11-12.

At no time did either Johnson Hyles or defense counsel contradict the Court's observations in this regard. Instead, Johnson Hyles continued to profess her innocence:

> I basically know what your decision is going to be because you feel that I am guilty, I know I didn't cause his death, and I know I don't deserve a life sentence, but I know I have to get the judgments from you today, but I know the man up above know the truth, so I am going to keep praying, and I am not going to give up. . . . I am not that cruel person that you all have me to be. I am not that person. And I just ask you what if it was your daughter in my shoes telling the truth and still get put in jail for nothing? Sent. Trans. 13-14.

On direct appeal, Johnson Hyles attacked every count of conviction as lacking sufficient evidence. See Johnson Hyles, 521 F.3d at 954 ("Hyles insists that there is insufficient evidence to convict her for: 1) conspiracy to use interstate facilities to commit a murder for hire or aiding and abetting; 2) conspiracy to deliver a firearm to a felon; and 3) possession of a firearm in furtherance of a crime of violence.").

Johnson Hyles' belated misgivings that she would have pleaded guilty, if only defense counsel had recommended a guilty plea, is incongruous with the record, particularly her protestations of innocence throughout the trial proceedings and as late as direct appeal.

18

Therefore, even if defense counsel were somehow deficient in plea negotiations (he was not), Johnson Hyles could not establish any prejudice therefrom. See United States v. Stevens, 149 F.3d 747, 748 (8th Cir. 1998) ("Even if counsel's performance were somehow inadequate, Stevens failed to establish that there was any reasonable probability that he would have acknowledged his guilt had he been properly advised about the risks of trial."); Engelen, 68 F.3d at 241 ("The record is completely barren of any evidence that Engelen would have acknowledged his guilt prior to trial.").

Particularly apt is the Eighth Circuit's reasoning in Sanders:

A defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer. Sanders, 341 F.3d at 723.

For the foregoing reasons, Johnson Hyles' counsel did not provide ineffective assistance in the context of plea negotiations.

## D. An Evidentiary Hearing is Not Required.

Finally, an evidentiary hearing is not required for the Court to resolve the issues raised in Johnson Hyles' motion. Rule 8(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, provides that the Court shall, upon a review of the files, records, and supporting evidence, determine whether an evidentiary hearing is required and/or dispose of a movant's motion as justice dictates.

It is well settled that the district court need not hold an evidentiary hearing for every allegation raised in a § 2255 motion. As noted by the Eighth Circuit:

A §2255 motion "can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." (citations

omitted).  Sanders v. United States, 341 F.3d 720, 722 (8th Cir. 2003) (quoting Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995)).

The issues raised by Johnson Hyles may be resolved against her without the necessity of the introduction of facts from outside the lengthy hearing, trial, and appellate record. Accordingly, because the hearing and trial transcripts, files, and records of the Court are adequate to dispose of Johnson Hyles' § 2255 claims, no evidentiary hearing is required.

## V.  Conclusion

WHEREFORE the Government respectfully requests that the Court deny Johnson Hyles' motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255.

Furthermore, for the reasons stated herein, the Government requests that the Court deny any motion by Johnson Hyles for a certificate of appealability for the failure of Johnson Hyles to make a substantial showing that she was denied a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).  See Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997).

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

s/ *Cristian M. Stevens*
CRISTIAN M. STEVENS (#98871)
Assistant United States Attorney
111 South Tenth Street, Room 20.333
St. Louis, Missouri 63102
(314) 539-2200

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system and by first-class mail, postage pre-paid, this 1st day of March, 2011, to Michael L. Goodwin, 600 W. Main Street, Suite 100, Louisville, KY 40202.

s/ *Cristian M. Stevens*
Assistant United States Attorney